1

2

3                    **UNITED STATES DISTRICT COURT**

4                         **DISTRICT OF NEVADA**

5  BRANDON M. JEFFERSON,              Case No. 3:18-cv-00064-HDM-CLB

6                       Petitioner,

7        v.                                        **ORDER**

8  PERRY RUSSELL,[1] et al.,

9                       Respondents.

10       Petitioner, Brandon M. Jefferson ("Jefferson") filed a *pro*

11  *se* amended petition under 28 U.S.C. § 2254. (ECF No. 47.) The

12  respondents have answered (ECF No. 57) and Jefferson has replied

13  (ECF Nos. 58 and 63).

14       In 2012, a jury convicted Jefferson of three counts of

15  sexual assault and one count of lewdness involving his five-

16  year-old daughter, and he was sentenced to imprisonment for

17  seventy years to life. (Exhibit 65 and ECF No. 18-24.)

18  Jefferson's amended petition asserts five grounds for relief,

19  one of which was previously dismissed as procedurally defaulted.

20  Two of the remaining claims – Grounds Three and Four – are

21  before the Court for review as to whether Jefferson can

22  establish cause and prejudice for their procedural default – and

23  the other two claims are before the court for merits review. For

24  the reasons discussed below, the petition will be denied.

25

26       [1] According to the state corrections department's inmate locator page,
    Jefferson is incarcerated at Lovelock Correctional Center. The department's
27  website reflects Tim Garrett is the warden for that facility.
    https://ofdsearch.doc.nv.gov/form.php. The Court will therefore direct the
28  clerk to substitute Tim Garrett for respondent Perry Russell, under, *inter
    alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

*Background*[2]

At trial, Cindy Lamug testified she and Jefferson were previously married and had a son, B.L., and daughter, C.J.[3] (Exhibit 56 and ECF No. 62-5 at 12–14, 22.) She said that during the summer of 2010, she worked from 4:00 p.m. to 10:00 p.m. while Jefferson watched the children. (*Id.* at 14–16, 22.)

C.J. testified when she was seven years old that when she was five years old, her father, Jefferson, stuck his penis ("tee-tee") in her vagina, butt, and mouth. (Exhibit 55 and ECF No. 62-4 at 41–45, 49–67.) She said it occurred more than one time in her parents' bedroom while her mother was at work, and on one occasion he stuck his penis in her vagina and mouth while they were in C.J.'s bedroom. (*Id.* at 49–70.) She said she cried on one occasion in her parents' bedroom. (*Id.* at 66–67.) C.J. said "green" pee came out of her father's penis into her mouth, and he told her to swallow it; but she pretended to do so and spit it out in the toilet. (*Id.* at 70–71.) She said her father told her not to tell anyone about their activities. (*Id.* at 61–62.)

B.L. testified when he was ten years old that on more than one occasion, while his mother was at work, Jefferson took his sister C.J. into his parents' bedroom, and on one occasion, he heard C.J. crying from the bedroom. (*Id.*) He said C.J. came out

---

[2] The Court summarizes the relevant state court record for consideration of the issues in the case. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.

[3] Pursuant to LR IA 6-1(a), the minor witnesses are referred to by their initials, "C.J." and "B.L."

of the bedroom looking like she was "hiding something" and on a "few" occasions, he asked her what happened, and she said he did not need to know. (*Id.* at 94-95.) B.L. never saw what happened with his father and C.J. while they were in the bedroom. (*Id.* at 137.) He said his father would take his sister to the bedroom "at least like every day my mother goes to work." (*Id.* at 124-25.)

Lamug testified that on September 14, 2010, she picked up the children at school and told the children Jefferson was "really being mean" and did not go to work that day. (Exhibit 56 and ECF No. 62-5 at 28-29.) She explained that Jefferson left the apartment and that she tried, without success, to locate him so she could drive him to work. (*Id.*) She said she told the children that if Jefferson did not return, she was going to leave him, and since it would just be the three of them, they had to work together, could have "no secrets," and that they "did a pinky swear." (*Id.* at 29-30.) On cross-examination, Lamug testified that when she told the children she was leaving the marriage, she had determined she was going to keep custody of their children. (*Id.* at 44.) C.J. testified that her parents fought a lot, her mother told her that her father did not treat her mother well, her mother told her she had to be on her mother's team and needed to tell her all the secrets, and they made a pinky-promise. (Exhibit 55 and ECF No. 62-4 at 76-77.) B.L. also testified their parents fought a lot, and their mother said their father was gone and asked C.J. and B.L. to be on their mother's team. (*Id.* at 113-15.)

Shortly after Lamug made these comments, C.J. said,

"[M]ommy, I have a secret to tell you." She told her mother that her dad "makes [her] suck his tee-tee" and told her not to tell anyone. (Exhibit 56 and ECF No. 62-5 at 31.) B.L. testified he overheard C.J. tell their mother that Jefferson "made her suck his penis" and explained that C.J. used the Tagalog word, "tee-tee," which means penis. (Exhibit 55 and ECF No. 62-4 at 97–100.) Lamug testified she asked C.J. when it happened and C.J. told her that it happened while Lamug was at work at night. (Exhibit 56 and ECF No. 62-5 at 31–32.) Lamug said C.J. told her that Jefferson pulls down her pants and puts his "tee-tee" "down there" and C.J. pointed at her private. (*Id.* at 32–33.) B.L. said his mother "seemed sort of shocked" and immediately called the police, and that they went to hospital that night. (Exhibit 55 and ECF No. 62-4 at 100–01.)

According to Detective Todd Katowich with the Las Vegas Metropolitan Police Department ("Metro"), he and Detective Matthew Demas conducted individual interviews with C.J., B.L., and Lamug. Then they arrested Jefferson and took him to the detective bureau where they handcuffed him and questioned him following *Miranda* warnings. (Exhibit 56 and ECF No. 62-5 at 77–81, 83–86, 88–89.) The compact disc recording of Jefferson's statement to police was admitted into evidence and played for the jury at trial. (Exhibit 1 and ECF No. 62-1 at 56; Exhibit 57 and ECF No. 18-16 at 54–57.)

Detectives Katowich and Demas each testified that Jefferson initially denied inappropriate contact with C.J. (Exhibit 56 and ECF No. 62-5 at 100–01, 123; Exhibit 57 and ECF No. 18-16 at 86.) However, according to Detective Katovich, about "25

minutes" into the interview, Jefferson admitted "his penis had gone in his daughter's mouth on at least one occasion, and possibly as many as three occasions," "that she had touched his penis with her hand on at least one occasion, but possibly as many as three occasions," and that "she had climbed on top of him and rubbed her vagina against his penis." (Exhibit 56 and ECF No. 62-5 at 99–100.) Katowich said Jefferson described having "pre-cum," but denied penetrating his daughter's vagina or anus or having a full orgasm with her. (*Id.* at 100–01.)

The defense, for its part, introduced expert testimony regarding the relationship between the interview techniques the detectives used to interview Jefferson and the occurrences of false confessions. (Exhibit 57 and ECF No. 18-16 at 130 *et seq.*)

Pediatric emergency room physician, Theresa Vergara, testified she conducted a "suspected child abuse and neglect" (SCAN) examination for C.J. at Sunrise Children's Hospital. (Exhibit 55 and ECF No. 62-4 at 3–4, 13.) A rape kit examination was not conducted because the abuse allegedly occurred more than a few hours before the examination. (*Id.* at 14.) Vergara said C.J. denied pain or burning when urinating and did not have a urinary tract infection. (*Id.* at 26–27.) She testified C.J.'s examination produced "normal" results as she found "no bruises or redness," "no active bleeding or localized redness," and the "rectum looked normal"; however, she did find a "hymenal mound." (*Id.* at 16–17, 25–26, 37.) She likened the mound to a callous on a finger from writing with a pen, and said, although repeated pressure to the hymen could cause the mound, it could also be C.J.'s "normal anatomy." (*Id.* at 18–20, 39, 41.) She agreed it

is sometimes possible to detect sustained long-term abuse, but she found nothing concrete on C.J except the nonspecific hymenal mound. (*Id.* at 33-34, 37, 40.) She said an examination will often produce normal results where the abuse is disclosed days or weeks afterward and is normal in most cases where the perpetrator confesses to sexually abusing a child. (*Id.* at 15, 24-25.)

Metro Forensic scientist Julie Marschner testified she conducted a DNA comparison analysis for the bedding taken from Jefferson's bedroom. (Exhibit 56 and ECF No. 62-5 at 47, 54-58, 70.) Marschner discovered semen that contained sperm cells consistent with Jefferson's DNA on a brown comforter and sheet, and a non-sperm DNA mixture (DNA from more than one person) for which Jefferson and Lamug could not be excluded as contributors, but for which C.J. was excluded as a contributor. (*Id.* at 60-61, 63, 66-67, 76-77.) Marschner discovered no semen on a white sheet and pink blanket taken from C.J.'s bed. (*Id.* at 67-69; 76.)

On or about December 31, 2010, Jefferson sent Lamug a letter, part of which she read to the jury during her testimony. It stated:

> I want the truth about us. For now, I'd like to correct some statements about me that surfaced last September. First, the whole thing was not my idea. I did not plan it. It happened, and I went along with it. That may sound like a funny way of describing it with a so-called confession, obtained only after my arresting officer coerced my innocent wife and daughter in an elaboration of acts beyond my character or physical capabilities.

(*Id.* at 36-39.)

*Standard*

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant a petition for a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather]

[t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10, 412) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as "a difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands state-court decisions be given the benefit of the doubt.") (internal quotation marks and citations omitted)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

Where there is no clearly established federal law, *i.e.*, no holding from the Supreme Court, stating a particular standard or rule at the time of the state court's decision, then, by definition, a petitioner cannot establish under AEDPA that the state court's decision was either contrary to or an unreasonable application of clearly established federal law. *See, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *see also Williams,* 529 U.S. at 390, 412 (Interpreting "[t]he meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'" contained in 28 U.S.C. § 2254(d)(1) as referring to "the holdings, as opposed to the dicta, of the

[Supreme] Court's decisions as of the time of the time of the relevant state-court decision."). A state court need not cite Supreme Court cases nor even be aware of Supreme Court cases so long as neither the reasoning nor the result of the state-court decision contradicts them. *Early v. Packer*, 537 U.S. 3, 8, (2003).

Under AEDPA, to conclude that a state court factual finding is an unreasonable factual finding, the reviewing court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

***Discussion***

**A.   Ground 2**

In ground 2, Jefferson alleges a violation of his right to conflict-free counsel under the Sixth and Fourteenth Amendments because a pretrial complaint to the state bar about one of his attorneys created a per se conflict of interest for which he need not demonstrate prejudice. (ECF No. 47 at 5.)

In October 2011, Jefferson sent the State Bar of Nevada a letter in which he claimed his public defender, Bryan Cox, "'lightly' verbally abuses [him] or ignores [his] outlook" and told him, "People like you belong in hell not prison." (Exhibit 105 and ECF No. 19-29 at 21-22.) Jefferson wrote that Cox's alleged comment "hurt," and he did not know if Cox "meant that because of the nature of [the] crime or simply because of [Jefferson's] African American heritage." (*Id.* at 22.)

On October 19, 2011, Jefferson filed a *pro se* motion

asserting several complaints about Cox. (Exhibit 35 and ECF No. 17-35 at 3-4.) The motion did not mention the complaint to the state bar, or the negative comment ascribed to counsel in that complaint. (*Id.* at 1-8.)

On November 1, 2011, the state district court held a hearing on the motion to dismiss. (Exhibit 36 and ECF No. 17-36 at 2-3.) At the outset of the hearing, Cox informed the state district court he wanted "what's best for my client." (*Id.*) Jefferson told the court he asked Cox "to do some things for [him] and he . . . hasn't come through," that he did not have his "full discovery yet," and based on things counsel said to him, he did not "feel comfortable" with him. (*Id.* at 3-4.) Jefferson explained that despite his requests, Cox failed to subpoena his employment records, call his family, or provide him discovery. (*Id.* at 4.) Defense counsel explained "there's been lots of visits" during which Jefferson could view discovery, but counsel was hesitant to leave him with copies as "nothing in the jail is private" and doing so might create a conflict with other inmates. (*Id.* at 4-6.) Counsel did not see Jefferson's employment records as "key" support for an alibi defense because no specific time was alleged for the offenses. (*Id.* at 6-7.) The state district court concluded the relief sought was unwarranted and denied the motion. (*Id.* at 7.)

Two days later, the state bar advised Jefferson that his grievance was sent to Cox with directions to respond in writing. (Exhibit 99 and ECF No. 19-23 at 83.) The letter informed Jefferson that the state bar's function was "to determine whether an attorney has violated the Rules of Professional

Conduct" and it could not "alter or affect in any way the outcome of private legal matters in court." (*Id.*)

Jefferson wrote letters dated March 28, 2012, and May 22, 2012, to Mr. Kohn at the Public Defender Office's sexual assault unit, complaining that Cox was not developing evidence to prove his innocence, was not prepared for trial, was prejudiced against him and "these types of cases," and believed Jefferson belonged in prison. (*Id.* at 74-75.)

On postconviction review, the state courts rejected Jefferson's claim that the filing of his state bar complaint created a conflict of interest that prejudiced his trial. After extensive legal and factual analysis, and discussions of cases from various jurisdictions, the Court of Appeals held that the filing of a bar complaint on its own did not create a presumption of prejudice and that Jefferson had not otherwise alleged any other actual conflict of interest resulting from the filing of the complaint to support a finding of a Sixth Amendment violation. The Court of Appeals explained in relevant part:

> Below, Jefferson did not assert that his counsel did anything in response to the filing of the bar complaint that would independently entitle Jefferson to relief. Nor did Jefferson contend that his bar complaint led to the imposition of any discipline upon his attorney that rendered his counsel ineffective. Consequently, Jefferson's contention was not that the complaint happened to trigger a chain of events that ended up producing an irreconcilable conflict between him and his attorney, but rather that the filing of the complaint, by itself, created an actual conflict without anything more happening.
>
> Thus, Jefferson would have been entitled to relief only if, as a matter of law, the mere filing of his bar complaint created a per se conflict of interest rising to the level of a violation of the

Sixth Amendment.

…

We agree with the weight of authority and hold that, as a matter of law, the mere filing of a bar complaint by a defendant against his attorney does not create a per se conflict of interest rising to the level of a violation of the Sixth Amendment. The filing of a bar complaint ought not become a routine method of forcing a change in appointed counsel after a district court motion has failed, or of obtaining postconviction relief on manufactured or hypothetical premises, when no actual conflict of interest otherwise existed.

(Exhibit 127 and ECF No. 20-16 at 2–10.) The state courts' determination was neither contrary to nor an unreasonable application of Supreme Court authority and does not constitute an unreasonable determination of the facts.

To establish ineffective assistance of counsel, the petitioner must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness"; and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Richter,* 562 U.S at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a

state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

The right to counsel includes the right to assistance by a conflict-free attorney. *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978)). "[T]he possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 350.

Prejudice may be presumed in a case where a "defendant shows that his counsel *actively* represented conflicting interests." *Id.* at 166, 175 (quoting *Sullivan*, 446 U.S. at 350 (emphasis added)). There is no clearly established Supreme Court precedent applying this presumption outside the context of joint representation. *Id.* at 174-76.

To show an actual "conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties," *Id.* at 171 (emphasis in original), a petitioner "must demonstrate some plausible alternative defense strategy or tactic might have been pursued but was not and the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *See Foote v. Del Papa*, 492 F.3d 1026, 1029-30 (9th Cir. 2007) (quoting *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006) (quotations

omitted)); *see also McClure v. Thompson*, 323 F.3d 1233, 1248 (9th Cir. 2003).

With respect to a breakdown in the attorney-client relationship, the Supreme Court has made it clear that the Sixth Amendment guarantee of counsel does not guarantee a meaningful attorney-client relationship. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). The Ninth Circuit has compared a legal conflict of interest, *i.e.*, an incompatibility between a lawyer's own private interest and those of the client, with a "conflict" in the sense that word is used in "common parlance" to describe a personality conflict. *Plumlee v. Masto,* 512 F.3d 1204, 1211 (9th Cir. 2008). As the Ninth Circuit explained:

> [W]e are not aware of any [Supreme Court case] that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust. Indeed, *Morris v. Slappy* is to the contrary.

*Id.*

The state courts here reasonably concluded that a defendant's filing of a bar complaint against counsel during his criminal proceedings does not create a per se conflict of interest. Indeed, there is no clearly established Supreme Court authority holding as much. *See Mickens,* 535 U.S. at 168 ("*Holloway* ... creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict."); *Brown v. Asuncion*, 2019 WL 4509207, at *19 (C.D. Cal. Apr. 12, 2019), *report and recommendation adopted*, 2019 WL 7037768 (C.D. Cal. Dec. 19, 2019) ("[T]here is

no authority—let alone clearly established Supreme Court authority—supporting the proposition that a conflict of interest arises whenever a criminal defendant files a state bar complaint against his trial counsel. On the contrary, courts routinely reject that argument.") (citing *Grady v. Biter*, 2014 WL 12684213, at *42 (S.D. Cal. Dec. 16, 2014) ("The trial judge's finding that Petitioner failed to show an actual conflict with counsel by simply writing a letter to the state bar association complaining about his trial counsel was correct, because Petitioner failed to demonstrate any adverse effect on his representation by the alleged conflict.") and *Harris v. Adams*, 2009 WL 2705835, *5 (E.D. Cal. Aug. 25, 2009) (holding petitioner's complaint to state bar and threat to sue counsel did not, in and of itself, give rise to conflict of interest)).

Further, the state courts reasonably determined that Jefferson failed to "assert that the filing of the bar complaint adversely affected his counsel's behavior or caused his counsel to defend him less diligently." Moreover, the record repels any such assertion, as Cox vigorously represented Jefferson throughout pretrial and trial proceedings, and Jefferson has not established that Cox, as a result of any conflict, failed to pursue an avenue of defense that would have been more beneficial to Jefferson.

During *voir dire*, Cox stressed the importance of presuming Jefferson's innocence and evaluating a child's testimony objectively, considering influences on the child and the bias of others, such as police or a parent who desired custody of the child during a divorce. (Exhibit 53 and ECF No. 18-12 at 16–34,

38-40, 42-43, 46-51, 66-70, 80-83, 89, 99.) Cox also inquired whether race would bias the jurors against Jefferson. (*Id.* at 85-86.) In closing, Cox strenuously argued that Jefferson was not guilty -- even utilizing an exhibit that stated "Brandon is innocent." (Exhibit 59 and ECF No. 18-18 at 88, 102, 120-26; Exhibit 146 and ECF No. 51-9 at 219.) Cox challenged C.J.'s credibility and the plausibility of her testimony and asserted that the allegations were motivated and created by Jefferson's wife who wanted a divorce and custody of the children. (Exhibit 59 and ECF No. 18-18 at 88-90, 95-96.) And finally, Cox argued that the detectives used interview techniques to find Jefferson's breaking point and entice him to admit things that didn't happen. (*Id.* at 102-03.)

In light of Cox's vigorous representation, and Jefferson's failure to show that "some plausible alternative defense strategy or tactic might have been pursued but was not," Jefferson has failed to establish any conflict between him and counsel that prejudiced his defense.

Finally, Jefferson's claim that a conflict of interest was evident when Cox failed to appear at the July 26, 2012, calendar call is belied by the record. (ECF No. 47 at 5.) Cox personally appeared at four separate calendar calls for the case. (Exhibits 41 at 3, 44 at 3, 45 at 2-3, 48 at 2-3; ECF Nos. 18 at 3, 18-3 at 3, 18-4 at 2-3, 18-7 at 2-3.) While Cox and co-counsel Kevin Speed both missed a calendar call and motion hearing scheduled for July 26, 2012, the record reflects that both attorneys were out of town on that date – and that the court was aware Cox would be out of town -- and that the lack of coverage was due to

a mix-up and nothing more. (Exhibit 50 and ECF No. 18-9 at 3-5; Exhibit 51 and ECF No. 18-10 at 3-7.) Cox, reached by the prosecutor during a break in the hearing, apologized for the mix-up and requested, and obtained, a continuation of the motion hearing set for the date. These facts do not support a finding that Cox labored under a conflict and do not support any finding of prejudice.

Given Cox's efforts before and during trial, and Jefferson's failure to point to specific actions that Cox took or declined to pursue that adversely affected Jefferson's interests in favor of another party, Jefferson has failed to establish a Sixth Amendment violation due to a conflict of interest. Accordingly, Jefferson is not entitled to federal habeas relief for ground 2.

**B.   Ground 3**

In ground 3, Jefferson alleges trial counsel was ineffective for failing to challenge the admissibility of Jefferson's confession on the grounds the police lacked probable cause to arrest him. (ECF No. 47 at 7-8.) The Court previously deferred ruling whether Jefferson can demonstrate cause and prejudice to overcome the procedural default for this claim. (ECF No. 56 at 16.)

Where a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result

in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To demonstrate cause, the petitioner must establish that some external and objective factor impeded efforts to comply with the state's procedural rule. *E.g., Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Hiivala v. Wood*, 195 F.3d. 1098, 1105 (9th Cir. 1999). "[T]o establish prejudice, [a petitioner] must show not merely a substantial federal claim, such that 'the errors . . . at trial created a possibility of prejudice,' but rather that the constitutional violation 'worked to his actual and substantial disadvantage.'" *Shinn v. Ramirez*, ___ U.S. ___, 2022 WL 1611786, at *7 (May 23, 2022) (citing *Carrier*, 477 U.S. at 494 and quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

The Supreme Court has provided an alternative means to overcome the cause requirement for purposes of overcoming a procedural default for an ineffective assistance of trial counsel claim where a petitioner can show that he received ineffective assistance of counsel in his initial state habeas proceeding. *Martinez*, 566 U.S. at 9. The Supreme Court outlined the necessary circumstances as follows:

> [W]here (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 18).

A procedural default will not be excused if the underlying ineffective-assistance-of-counsel claim "is insubstantial," *i.e.,* lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*, the Supreme Court cited the standard for issuing a certificate of appealability as analogous support for whether a claim is substantial. *Martinez*, 566 U.S. at 14. A claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336.

### 1.   Additional Background

Prior to Jefferson's arrest, C.J. told Detectives Demas and Katowich that she understood the difference between the truth and a lie and agreed she would speak only the truth. (Exhibit 146 and ECF No. 51-9 at 107, 109-111.) C.J. denied having any secrets and told detectives, "[n]obody touches me at the privates." (*Id.* at 115, 120.) Demas told C.J. he heard something a little different that day, and asked her, "Did you tell somebody that somebody might have touched your private" and C.J. replied "[n]obody touched my private." (*Id.* At 120-21.) Thereafter, the following conversation ensued:

> Q:   Oh.
>
> Q:   Have you ever had anybody make you touch their privates?
>
> A:   Mm-mm.
>
> Q:   Did you tell, did you tell somebody that?

1     A:    Uh . . .

2     Q:    'Cause you know you're not in trouble for anything, right?

3     A:    Somebody made me touched [sic] their private.

4

5     Q:    Who did?

6     A:    My mom called the police and said like mm [sic] my dad made me touch all his privates.

7     Q:    He did? How did he do that?

8     A:    (no audible response)

9     Q:    How did he do that?

10    A:    Mm, I don't know.

11    Q:    You don't know?

12    A:    No.

13    Q:    Well, how'd you know it happened?

14    A:    He told me to keep it a secret.

15    Q:    Who did?

16    A:    My dad.

17    Q:    Well when did this happen?

18    A:    When my mom was at work.

19    Q:    Yeah? Well where'd it happen at?

20    A:    She goes to work at Sundays and he made me do it.

21

22    Q:    Okay. But where? Where did he make you do it?

23    A:    Um, he made me do it like in his room.

24    Q:    Yeah? Where in his room?

25    A:    In his bed.

26 (*Id.* at 121–22.)

27       C.J. went on to tell the detectives her father wanted her

28 to suck one of his privates, and it hurt when her father "was

putting his private" in her private. (*Id.* At 122–23.) She told the detectives that her father made her suck on one of his privates, about seven times, and green liquid came out of her father's private. (*Id.* at 124–26.) She told them her father put his private in her private seven times. (*Id.* at 129.) She told them that one time in her bedroom, her father made her touch his private with her hand like she was pulling a tree and demonstrated the action for the detectives. (*Id.* at 128.) She told them the last time it happened was on the Sunday one week and two days prior to the interview and provided additional details about how the crimes were committed. (*Id.* at 125–35.) When asked why she told her mother about it, C.J. answered "I just wanted to tell her just so she'd know," and she denied anything happened that day to make her tell her mother about it. (*Id.* at 131.)[4]

Trial counsel filed a pretrial motion to suppress Jefferson's statement to police on the grounds that it was involuntary but did not assert the detectives lacked probable cause to arrest Jefferson. (Exhibit 12 and ECF No. 62-2.) During the evidentiary hearing on the motion to suppress evidence, Demas agreed he had no physical evidence at the time of Jefferson's interview, had only the words of C.J., B.L., and

---

[4] At a hearing to determine whether C.J.'s statements to her mother or Detective Demas would be admissible should C.J. not testify, pursuant to NRS § 51.385(2), the state district court determined C.J.'s statements to her mother were admissible due to factors that guaranteed trustworthiness, including the spontaneity of the statements and that her mother did not repeatedly question C.J. (Exhibit 42 and ECF No. 62-3 at 66–67.) The court, however, determined C.J.'s statements to Demas were not admissible because they lacked a guarantee of trustworthiness due to Demas's repetitive questioning. (*See* Exhibit 42 and ECF No. 62-3 at 66–67.)

Lamug, and that the case boiled down to their word against Jefferson's word. (Exhibit 30 and ECF No. 17-30 at 26, 35.) After listening to the tape and reading the transcript for Jefferson's interview with the detectives, the state district court concluded Jefferson's statement was voluntarily given and denied the motion to suppress. (*Id.* at 46, 51.)

At trial, Demas admitted that, when he arrested and interviewed Jefferson, he did not expect to receive DNA evidence and the hospital had not confirmed the abuse. (Exhibit 57 and ECF No. 18-16 at 54-57.) Demas said he interviewed Jefferson because C.J.'s statements were corroborated by B.L. and C.J.'s mother. (*Id.* at 104, 114-16.)

**2. Applicable Legal Principles**

An arrest without a warrant is valid if the arrest is supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 216, (1979) (holding officers violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation).

"Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (citing *Brinegar v. United States,* 338 U.S. 160, 175-76, (1949) (internal quotation marks omitted); *Ornelas v. United States,* 517 U.S. 690, 696 (1996); and *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

Probable cause is an objective standard and the determination of whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 152-53 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.") (citations omitted). "[N]either certainty, nor proof beyond a reasonable doubt, is required for probable cause to arrest." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) (citation omitted).

Under certain circumstances, courts have held police may rely upon the statement of a child for purposes of determining whether there is probable cause to make an arrest. *See, e.g., John v. City of El Monte*, 515 F.3d 936, 940-41 (9th Cir. 2007) (probable cause existed to arrest for molestation of a ten-year-old where officer drew upon his experience and special training in dealing with sexual abuse of children in evaluating the child's story); *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998) (three-year-old girl's allegations of sexual abuse, along with consistent medical evidence and her statements to her mother, were sufficiently reliable and trustworthy "at their core to form the basis for probable cause to arrest" the defendant); *Easton v. City of Boulder, Colo.,* 776 F.2d 1441, 1449-51 (10th Cir. 1985) (finding probable cause to arrest where statements of three-year-old child was corroborated by five-year-old child, who both identified the abuser and the location of the abuse inside the abuser's apartment).

On the other hand, courts have in some cases held no probable cause existed when police failed to conduct further investigation about a child's allegations of sexual abuse. *See, e.g., Stoot*, 582 F.3d at 918-22 (no probable cause to arrest juvenile solely on four-year-old's allegations where four-year-old changed her allegations, confused the juvenile with another boy, and recounted events that had occurred when she was three); *Cortez v. McCauley,* 478 F.3d 1108, 1113, 1116–1118 (10th Cir. 2007) (no reasonably trustworthy information supported probable cause to arrest where statement attributed to a barely-verbal two-year-old child that her babysitter's "boyfriend" "hurt her pee pee" was relayed by telephone to the officers, from the nurse, who heard it from the mother who ostensibly heard it from the child, and officers neither spoke directly to the child or her mother nor waited for medical results, before making the arrest); *United States v. Shaw,* 464 F.3d 615, 624 (6th Cir. 2006) (holding sole reliance upon mother's allegation that child made a statement indicating possible abuse insufficient to establish probable cause where officers did not speak with child and made no effort to corroborate mother's allegations before arresting defendant).

In Nevada, there is no requirement that the testimony of a child victim of sexual assault be corroborated, and the victim's testimony alone, if believed beyond a reasonable doubt, is sufficient to sustain a guilty verdict. *Gaxiola v. State*, 121 Nev. 638, 647–50, 119 P.3d 1225, 1232 (2005) ("This court has repeatedly stated that the uncorroborated testimony of a victim, without more, is sufficient to uphold a rape conviction.").

### 3.   Disposition of Ground 3

Jefferson fails to meet his burden to overcome the procedural default under *Martinez* because he fails to demonstrate a substantial claim that trial counsel was ineffective by failing to challenge probable cause for Jefferson's arrest or that postconviction counsel's failure to assert the claim of ineffective assistance of trial counsel was deficient or prejudicial.

Trial counsel's failure to challenge the arrest as lacking probable cause did not fall below an objective standard of reasonableness. At the time of Jefferson's arrest, the detectives did not rely on hearsay, but instead interviewed C.J., and did so separately from her mother and brother shortly after C.J. spontaneously disclosed the abuse to her mother in B.L.'s presence. C.J. was five years old and was detailing relatively recent abuse. The circumstances and timing of the abuse were corroborated by her brother, B.L., who was present in the house at the time of the abuse. And C.J. never accused anyone other than her father of perpetrating the abuse. Although C.J. initially denied anyone touched her privates, according to the interview transcript, she did not simply regurgitate specific details provided by the detectives; instead, she provided core details about the abuse to the detectives after she was told she was not in trouble. *See Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (stating "[i]nterviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them . . .") Given the statements available to

the detectives when they arrested Jefferson, an objectively reasonable trial attorney could determine that, under the totality of the circumstances, the facts known to the detectives were sufficiently reliable and trustworthy to support probable cause and, thus, a motion to suppress on those grounds would have been futile.

For the same reasons, Jefferson also fails to demonstrate deficient performance by postconviction counsel or prejudice therefrom. An objectively reasonable postconviction attorney could determine the record failed to support a claim that trial counsel was ineffective in failing to challenge probable cause for Jefferson's arrest. Further, there is no reasonable probability the result of the postconviction proceedings would have been different had postconviction counsel raised this claim.

Accordingly, Jefferson has failed to establish cause and prejudice to overcome the procedural default of this claim. Ground 3 will therefore be dismissed.

**C. Ground 4**

In ground 4, Jefferson alleges trial counsel was ineffective for failing to assert that Jefferson invoked his right to silence during his interview with police when he stated, "That's all I can say." (ECF No. 47 at 9.) The Court previously deferred ruling whether Jefferson can demonstrate cause and prejudice under *Martinez* to overcome the procedural default of this claim. (ECF No. 56 at 16.)

**1.   Additional Background**

According to the transcript of Jefferson's interview with

the detectives following his arrest, Detective Demas read Jefferson his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Jefferson confirmed he understood those rights. (Exhibit 146 and ECF No. 51-9 at 54-55.) Jefferson was silent in response to some of the questions addressed to him during the interview but answered other questions. (*Id.* at 54-106.) At one point, the following conversation occurred:

> Q: So—we want to know is what's causing this behavior.
>
> A: I—what—I maybe—maybe um, what—what—me not having money. You know, I having a beer every now and then. That's about it. That's all I can say.
>
> Q: What goes through you—
>
> A: __ --
>
> Q: --when—when you ask her to come to your room? What goes on?
>
> A: I don't ask her to come to my room, sir. I mean it's—I mean I give her a little hug, a little kiss or something like that . . . .

(*Id.* at 80.)

In the motion to suppress Jefferson's statement, counsel did not contend Jefferson invoked his rights to silence following the *Miranda* warnings. (Exhibit 12 and ECF No. 62-2 at 4-11.)

At trial, Demas testified he read Jefferson his *Miranda* rights from a card before beginning the interview, that Jefferson stated he understood his rights, and that Jefferson never invoked any of those rights. (Exhibit 57 and ECF No. 18-16 at 53, 97-98.) Defense witness Dr. Mark Chambers testified that according to his review of Jefferson's interview transcript,

Jefferson "did not" say he wished to cease questioning or stop talking to the police. (*Id.* at 215.)

### 2. Applicable Legal Principles

Once *Miranda* warnings are given, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74; *see, e.g., Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011) (holding a reasonable police officer under the circumstances would have understood Tice's statement, "I have decided not to say any more," to mean he no longer wished to answer questions about the crimes, and, therefore, the officer should have stopped asking questions).

On the other hand, an ambiguous invocation of the right to remain silent may not give rise to a *Miranda* violation. *See Berghuis v. Thompson*, 560 U.S. at 375, 380–82 (2010) (where defendant read out loud, but refused to sign, the form stating *Miranda* warnings, his silence for two hours and forty-five minutes of a three-hour interrogation was insufficient to invoke his right to remain silent because he never stated he wished to remain silent, that he did not want to talk with police, or that he wanted an attorney). A statement may be ambiguous where it is open to more than one interpretation or reference or has a double meaning or reference. *See United States v. Rodriguez*, 518 F.3d 1072, 1075, 1077 (9th Cir. 2008) (holding that, following *Miranda* warnings, defendant's statement "I'm good for tonight" in response to a question whether he wished to speak with park rangers, was not an invocation of the right to silence because

the statement was ambiguous and could have meant he wished to talk to the rangers or did not wish to talk to them).

### 3. Disposition of Ground 4

Jefferson fails to meet his burden to overcome the procedural default of this claim under *Martinez* because he fails to demonstrate a substantial claim that trial counsel was ineffective in failing to challenge the admissibility of Jefferson's statements to the detectives on the grounds that Jefferson invoked his right to silence or that postconviction counsel's failure to assert the claim of ineffective assistance of counsel was deficient or prejudicial under *Strickland*.

The detectives read Jefferson the *Miranda* warning, and Jefferson confirmed he understood. In his interview, Jefferson never unambiguously stated he wished to remain silent, that he did not want to talk with the police, or that he wanted an attorney. Jefferson contends his statement, "That's all I can say" constitutes an invocation of his right to silence. However, an objectively reasonable trial attorney could determine that, under the circumstances, Jefferson's statement meant he could not further explain why he committed the offenses, rather than an expression of a desire to remain silent and not speak with the detectives. The statement was, at best, ambiguous. Therefore, counsel's failure to challenge the statement as an invocation of the right to silence that warranted suppression of any part of Jefferson's confession did not fall below an objective standard of reasonableness. Moreover, given the statement is not an unambiguous invocation of the right to silence, Jefferson fails to demonstrate there is a reasonable

probability the result of the proceedings would have been different had trial counsel asserted the claim.

By the same token, postconviction counsel did not perform below an objective standard of reasonableness in failing to pursue a claim that trial counsel was ineffective, as an objectively reasonable postconviction attorney could determine that under the totality of the circumstances such a claim would have been futile.

Accordingly, Jefferson has failed to establish cause or prejudice to overcome the procedural default of this claim. Ground 4 will therefore be dismissed.

**D.   Ground 5**

In ground 5, Jefferson alleges there is insufficient evidence to support his convictions in violation of the Fourteenth Amendment. (ECF No. 47 at 11.)

**1.   Additional Background**

Jefferson was convicted of sexual assault with a minor under the age of fourteen for penetrating C.J.'s vaginal opening with his penis against her will, or under conditions in which he knew, or should have known, C.J. was mentally or physically incapable of resisting or understanding the nature of his conduct, in violation of Nevada Revised Statutes § 200.364 and § 200.366. (Exhibit 39 and ECF No. 17-39 at 4; Exhibit 65 and ECF No. 18-24 at 2.)

Jefferson was further convicted of sexual assault of a minor under the age of fourteen for subjecting C.J. to sexual penetration, by fellatio, for placing his penis on and/or into C.J.'s tongue and/or mouth against her will, or under conditions

in which he knew, or should have known, C.J. was mentally or physically incapable of resisting or understanding the nature of his conduct. (Exhibit 39 and ECF No. 17-39 at 5; Exhibit 65 and ECF No. 18-24 at 2.)

Finally, Jefferson was convicted of lewdness with a child under the age of fourteen in violation of Nevada Revised Statutes § 201.230, by willfully, lewdly, unlawfully, and feloniously committing a lewd or lascivious act upon or with the body, or any part or member, of C.J. by using his penis to touch and/or rub and/or fondle the genital area of C.J. and/or causing and/or directing C.J. to use her genital area to touch and/or rub his penis with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of Jefferson or C.J. (Exhibit 39 and ECF No. 17-39 at 4-5; Exhibit 65 and ECF No. 18-24 at 3.)

### 2.   Applicable Legal Principles

According to *Jackson v. Virginia*, a jury's verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could find the essential elements of the offense beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (emphasis in original). A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support his conviction. *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324 n.16.) A reviewing court, "faced with a record of historical facts that

supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326.)

### 3.   State Court's Determination

On direct appeal, the Supreme Court of Nevada rejected Jefferson's claim that there was insufficient evidence to support the jury's verdict:

> In this case, C.J. testified with specificity as to four separate occasions of sexual abuse—three in Jefferson's bedroom, and one in her bedroom. She testified that on each of the three occasions in the master bedroom, Jefferson put his penis in her mouth, vagina, and anus, and on the fourth occasion, in her bedroom, he put his penis in her mouth and vagina. Finally, Jefferson's own confession also supports the lewdness and sexual assault charges as he stated that on different occasions C.J. rubbed her vagina against his penis, touched his penis, and put his penis in her mouth. Therefore, we conclude there was sufficient evidence supporting the jury's conviction because in viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Jefferson guilty of three counts of sexual assault and one count of lewdness beyond a reasonable doubt. *Rose*, 123 Nev. at 202, 163 P.3d at 414; *see* NRS 200.366(1); NRS 201.230.

(Exhibit 97 and ECF No. 19-21 at 12-13.) The state court's determination was neither contrary to, nor an unreasonable application of, Supreme Court authority and was not based on an unreasonable determination of the facts.

### 4.   Disposition of Ground 5

#### a.   Sexual Assault

Sexual assault is a general intent crime. *Honeycutt v. State*, 118 Nev. 660, 670, 56 P.3d 362, 368 (2002), *overruled on other grounds by Carter v. State*, 121 Nev. 759, 121 P.3d 592

1    (2005).

2        At the time of Jefferson's crimes, Nevada Revised Statutes

3    § 200.366 defined sexual assault as follows:

4        A person who subjects another person to sexual
         penetration, or who forces another person to make a
5        sexual penetration on himself or herself or another,
         or on a beast, against the will of the victim or under
6        conditions in which the perpetrator knows or should
         know that the victim is mentally or physically
7        incapable of resisting or understanding the nature of
         his or her conduct, is guilty of sexual assault.

8

9    Nev. Rev. Stat. § 200.366, *as amended by* Laws 2007, c. 528 § 7.

10   Sexual penetration meant "cunnilingus, fellatio, or any

11   intrusion, however slight, of any part of a person's body or any

12   object manipulated or inserted by a person into the genital or

13   anal openings of the body of another, including sexual

14   intercourse in its ordinary meaning." *Id.* § 200.364(4), *as*

15   *amended by* Laws 2009, c. 300, § 1.1.

16       "[T]he testimony of a sexual assault victim alone is

17   sufficient to uphold a conviction;" however, "the victim must

18   testify with *some* particularity regarding the incident in order

19   to uphold the charge." *LaPierre v. State*, 108 Nev. 528, 531, 836

20   P.2d 56, 58 (1992) (emphasis in original) (citations omitted).

21   Separate and distinct acts of sexual assault committed as a part

22   of a single criminal encounter may be charged and convicted as

23   separate counts. *Peck v. State*, 7 P.3d 470, 116 Nev. 840 (2000).

24       Here, although Jefferson denied penetrating his daughter,

25   C.J. testified with particularity that Jefferson put his private

26   in her private on more than one occasion, in the master bedroom,

27   when she was five years old and while her mother was at work,

28   and one time while they were in C.J.'s bedroom, and that it hurt

when her father put his private inside her private. Viewing the evidence in the light most favorable to the prosecution, the state courts reasonably determined that a rational jury could find beyond a reasonable doubt that Jefferson sexually abused his daughter by penetrating her vaginal opening with his penis.

The state courts also reasonably determined the record presented sufficient evidence for a rational trier of fact to find Jefferson guilty of sexual assault by fellatio. C.J. testified that her father put his penis in her mouth on more than one occasion while they were in the master bedroom, when she was five years old while her mother was at work, and on one occasion while they were in C.J.'s bedroom. C.J. also said her father told her to swallow "pee" that came out of his penis. Jefferson admitted to the detectives that his daughter had her mouth on his penis for two to three minutes on at least two, but no more than three, occasions. Jefferson nonetheless claims there is insufficient evidence because it is illogical that he committed the crimes when C.J. testified she never saw his penis. However, C.J.'s testimony was more specific:

> [BY THE STATE:]
>
> Q:   When your dad would put his penis
>      either in your mouth, or in your
>      vagina, or in your butt, did you ever –
>      did you ever actually see his penis?
>      Did you ever actually look at it?
>
> A:   No.
>
> Q:   Did you ever see it?
>
>      . . . .
>
> THE WITNESS: I can't remember.
>
> THE STATE:

> Q:   Okay. Can you remember – do you remember what it looked like at all?
>
> A:   Yes.
>
> Q:   You do?
>
> A:   Yes.
>
> Q:   What did it look like?
>
> A:   Brown.

(ECF No. 18-14 at 72.) Because C.J. said she saw that his penis was brown, a rational trier of fact could infer that what C.J. meant by her answer was that she did not see his penis when it was inside her mouth, vagina, or anus. As stated, for purposes of review of an insufficiency of evidence claim, a reviewing court presumes the jury resolved conflicting inferences in favor of the prosecution and must defer to that resolution. *Jackson*, 443 U.S. at 326.

Given that no corroboration was necessary if the jury believed C.J. beyond a reasonable doubt, C.J.'s specificity in her testimony, Jefferson's confession, and Jefferson's letter to his wife, and viewing the evidence in the light most favorable to the prosecution, a rational jury could find Jefferson sexually abused C.J. by penetrating her mouth with his penis beyond a reasonable doubt on at least two occasions.

### b.   Lewdness

At the time of Jefferson's crimes, lewdness with a minor under 14 years of age was proscribed as follows:

> 1. A person who willfully and lewdly commits any lewd or lascivious act, other than acts constituting the crime of sexual assault, upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or

gratifying the lust or passions or sexual desires of that person or of that child, is guilty of lewdness with a child.

NRS 201.230(1), *as amended by* Laws, 2005, c. 507, § 33, eff. July 1, 2005.

Here, the state courts reasonably determined there was sufficient evidence for a rational trier of fact to find Jefferson guilty of lewdness with a child under fourteen years of age. According to Jefferson's statement to the detectives, which was played for the jury, C.J. touched his penis with her hand on "not more than three" occasions, his penis touched C.J.'s vagina but did not penetrate her, C.J. rubbed her vagina against his penis, and, as a result of these activities, Jefferson developed pre-cum. B.L. testified his father took C.J. to the bedroom every time their mother was at work. Based on Jefferson's statement, and the testimony of Lamug, C.J., and B.L., as well as all reasonable inferences that may be drawn from that evidence, a rational jury could determine that Jefferson was guilty of lewdness, separate from the sexual assaults.

For the foregoing reasons, the state courts reasonably applied *Jackson* in rejecting Jefferson's claim that there was insufficient evidence to support the verdicts, and its determinations were not based on an unreasonable determination of the facts. Therefore, Jefferson is not entitled to relief on ground 5.

### *Certificate of Appealability*

In order to proceed with an appeal, Jefferson must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R.

App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a defendant must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Allen*, 435 F.3d at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951 (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, Jefferson has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.*

The court has considered the issues raised by Jefferson, with respect to whether they satisfy the standard for issuance of a certificate of appealability, and determines that none meet that standard. Accordingly, Jefferson will be denied a certificate of appealability.

### Conclusion

IT THEREFORE IS ORDERED that the amended petition (ECF No. 47) is DENIED, and this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that Jefferson is DENIED a certificate of appealability.

IT IS FURTHER ORDREED that Jefferson's requests for an evidentiary hearing are DENIED.

1       IT IS FURTHER ORDERED the Clerk of Court is directed to
2  substitute Tim Garrett for Respondent Perry Russell.

3       The Clerk of the Court shall enter final judgment
4  accordingly in favor of respondents and against Jefferson,
5  dismissing this action with prejudice.

6       DATED: this 8th day of August, 2022.

HOWARD D. MCKIBBEN
UNITED STATES DISTRICT JUDGE